Submitted on the record and brief December 6, 1993, accused disbarred
January 6, 1994

In re Complaint as to the Conduct of

# JOHN M. BIGGS,
*Accused.*

(OSB 91-18, 91-19, 91-20, 91-21, 91-22,
91-23, 91-24, 91-25, 91-26, 91-27, 91-28,
91-40, 91-41, 91-42, 91-43, 91-44, 91-45,
91-46, 91-47, 91-48, 91-49, 91-75; SC S40526)

864 P2d 1310

Susan Roedl Cournoyer, Assistant Disciplinary Counsel, Oregon State Bar, Lake Oswego, for the Oregon State Bar.

No appearance *contra.*

Before Carson, Chief Justice, Gillette, Van Hoomissen, Fadeley, Unis, and Graber, Justices, and Peterson, Senior Judge, Justice pro tempore.

PER CURIAM

## PER CURIAM

This is a disciplinary proceeding brought by the Oregon State Bar (Bar), charging the accused, in 39 causes of complaint, with engaging in conduct that violated certain standards of professional conduct. We review *de novo* the decision of a trial panel of the Disciplinary Board, which recommended that the accused be suspended from the practice of law for two years.[1] ORS 9.536(3); Rules of Procedure (BR) 10.6.

From our independent review of the evidence, we find that the accused is guilty of numerous violations of DR 1-102 (A)(3)[2] (conduct involving dishonesty, fraud, deceit or misrepresentation), DR 6-101(B)[3] (neglect of a legal matter entrusted to the lawyer), DR 9-101(A)[4] (failure to deposit into and maintain client funds in identifiable trust accounts), and DR 9-101(B)(3)[5]

---

[1] The trial panel recommended that reinstatement be denied unless the accused "can demonstrate that he has consistently received treatment for Bi-Polar Disorder, has not suffered additional manic episodes, has taken all medication prescribed for Bi-Polar Disorder, has abstained from the use of alcohol and undergone alcohol treatment, has repaid the Bar for the compensation it paid clients, and has written letters of apology and explanation to the clients harmed."

[2] DR 1-102(A)(3) provides:

"It is professional misconduct for a lawyer to:

"* * * * *

"(3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"

[3] DR 6-101(B) provides:

"A lawyer shall not neglect a legal matter entrusted to the lawyer."

[4] DR 9-101(A) provides:

"All funds of clients paid to a lawyer or law firm, including advances for costs and expenses, shall be deposited and maintained in one or more identifiable trust accounts in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

"(1) Funds reasonably sufficient to pay account charges may be deposited therein.

"(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client in which event the disputed portion shall not be withdrawn until the dispute is finally resolved."

[5] DR 9-101(B)(3) provides:

"A lawyer shall:

"* * * * *

"(3) Maintain complete records of all funds, securities and other properties of a client coming into the possession of the lawyer and render appropriate accounts to the lawyer's client regarding them."

(failure to maintain complete records of client funds and render appropriate accounting to client). We also find the accused guilty of violating DR 2-110(A)(2)[6] (failure to avoid foreseeable prejudice to client on withdrawal of employment) and DR 2-110(B)(3)[7] (failure to withdraw from employment because of mental or emotional condition). We disbar the accused.

The accused practiced law in Eugene from 1969 to 1982. In June 1982, he moved to the east coast to engage in business that did not include the practice of law. After unsuccessful business undertakings on the east coast, in Texas, and in Portland, Oregon, the accused returned to Eugene in 1989. He opened a law office, renting space from another lawyer. The accused represented clients on referral from that lawyer, including participants in a prepaid legal plan and other walk-in clients. Most of his cases involved family law (marital dissolutions, child support, visitation disputes, adoptions, and guardianships).

From January through July 1990, the accused was retained by the 22 clients listed below. He received fees and costs from each client, but he did not enter into a written fee agreement with any of them. With respect to those 22 clients, the accused admits the following facts:

1. *Benoit*

    a.   Benoit retained the accused to represent him in a dissolution of marriage.

    b.   Benoit paid the accused $500.

---

[6] DR 2-110(A)(2) provides:

"In any event, a lawyer shall not withdraw from employment until the lawyer has taken reasonable steps to avoid foreseeable prejudice to the rights of the lawyer's client, including giving due notice to the lawyer's client, allowing time for employment of other counsel, delivering to the client all papers and property to which the client is entitled, and complying with applicable laws and rules."

[7] DR 2-110(B)(3) provides:

"A lawyer representing a client before a tribunal, with its permission if required by its rules, shall withdraw from employment, and a lawyer representing a client in other matters shall withdraw from employment, if:

"* * * * *

"(3) The lawyer's mental or physical condition renders it unreasonably difficult for the lawyer to carry out the employment effectively."

c. The accused did no work.

d. The accused did not deposit the $500 into his trust account.

e. The accused did not return the $500 to Benoit.

f. The accused did not maintain a complete record of the $500.

2. *Jefferson*

a. Jefferson retained the accused to represent her in a dissolution of marriage.

b. Jefferson paid the accused $408.

c. The accused did some work for Jefferson, but he did not prepare a judgment of dissolution.

d. The accused deposited the money into his trust account.

e. The accused withdrew $210 from his trust account.

f. The accused did not return the $210 to Jefferson.

3. *Peck*

a. Peck retained the accused to represent her in a dissolution of marriage.

b. Peck paid the accused $432 for attorney fees and costs and later paid an additional $89 for filing fees.

c. The accused deposited the $432 in trust, but he did not deposit the $89 in trust.

d. The accused did not maintain complete records of the $89.

e. The accused did some work, but he did not prepare and file a judgment.

f. The accused withdrew $343 from trust.

g. The accused did not return the $343 to Peck.

4. *Faile*

a. Faile retained the accused to represent her in a dissolution of marriage.

b. Faile paid the accused $460.

  c. The accused deposited the $460 in trust.

  d. The accused did some work, but he did not prepare or file a judgment.

  e. The accused withdrew $460 from trust.

  f. The accused did not return the $460 to Faile.

## 5. *Masada Corporation*

  a. Masada retained the accused for representation in a real property transaction and to form a corporation.

  b. Masada paid the accused $400 for attorney fees and costs.

  c. The accused did not deposit the $400 in trust.

  d. The accused did not maintain a complete record of the $400.

  e. The accused did some work, but he did not do all the work for which he was retained.

  f. The accused used the $400.

  g. The accused did not return the $400.

## 6. *Suppes*

  a. Suppes retained the accused to represent her in a child support and custody matter.

  b. Suppes paid the accused the sum of $500 for attorney fees and costs.

  c. The accused did not deposit $400 of Suppes' money in the trust account.

  d. The accused withdrew $100 from trust.

  e. The accused did not return the $500.

  f. The accused did some work, but he never filed any documents with the court.

## 7. *Carter*

  a. Carter retained the accused for representation in a guardianship proceeding.

  b. Carter paid the accused $300 for attorney fees and costs.

  c. The accused performed no legal services.

d.   The accused did not deposit the $300 in his trust account.

e.   The accused used the $300.

f.   The accused did not maintain a complete record of the $300.

g.   The accused did not return the $300 to Carter.

8. *Brohmer*

a.   Brohmer retained the accused for representation in a dissolution of marriage.

b.   Brohmer paid the accused $400 for attorney fees and costs.

c.   The accused deposited the $400 in trust.

d.   The accused performed no legal services for Brohmer.

e.   The accused withdrew $400 from trust.

f.   The accused did not maintain a complete record of the $400.

g.   The accused did not return the $400 to Brohmer.

9. *Poland*

a.   Poland retained the accused to represent her in an adoption.

b.   Poland paid the accused $247 for attorney fees and costs.

c.   The accused deposited the $247 in trust.

d.   The accused performed no legal services for Poland.

e.   The accused withdrew $247 from trust.

f.   The accused did not return the $247 to Poland.

10. *White*

a.   White retained the accused to represent him on a claim relating to a franchise.

b.   White paid the accused $1,000 for legal fees for services up to and including filing suit.

c.   The accused deposited the $1,000 in trust.

    d.   The accused did not maintain a complete record of the $1,000.

    e.   The accused did some work, but he failed to prepare and file a complaint.

    f.   The accused withdrew $835 from trust.

    g.   The accused did not return the $1,000.

11.  *To*

    a.   To retained the accused to represent him in a matter relating to an employment contract.

    b.   To paid the accused $300 for attorney fees.

    c.   The accused did not deposit the $300 in trust.

    d.   The accused performed no substantial legal work for To.

    e.   The accused did not return the $300 to To.

12.  *Brown*

    a.   Brown retained the accused to represent him in a dissolution of marriage.

    b.   Brown paid the accused $500 for attorney fees and costs.

    c.   The accused deposited the $500 in trust.

    d.   The accused did some work, but he did not prepare or file the judgment.

    e.   The accused withdrew the $500 from trust.

    f.   The accused has not returned the $500 to Brown.

13.  *Abell*

    a.   Abell retained the accused for representation in a landlord-tenant matter.

    b.   Abell paid the accused $50 for attorney fees and costs.

    c.   The accused did not maintain a complete record of the $50.

14.  *Lockhart*

    a.   Lockhart retained the accused to represent him in a proceeding to modify a judgment.

b.   Lockhart paid the accused $400 for attorney fees and costs.

c.   The accused did not maintain a complete record of the $400.

15.   *Alicea*

a.   Alicea retained the accused to represent him in a proceeding to modify a judgment.

b.   Alicea paid the accused the sum of $525.

c.   The accused did not maintain a complete record of the $525.

16.   *Duncan*

a.   Duncan retained the accused to represent her in recovering payments for property.

b.   Duncan paid the accused $200 for attorney fees.

c.   The accused did not maintain a complete record of the $200.

17.   *Null*

a.   Null retained the accused to represent him in a proceeding to modify a judgment.

b.   Null paid the accused $180.50 for attorney fees and costs.

c.   The accused did some work, but he did not obtain a modification.

d.   The accused did not maintain a complete record of the $180.50.

18.   *Collier*

a.   Collier retained the accused to represent her in a dissolution of marriage.

b.   Collier paid the accused $275 for attorney fees and costs.

c.   The accused did not maintain a complete record of the $275 and did not render an accounting.

19.   *Williams*

a.   Williams retained the accused to represent him in a dissolution of marriage.

 b. Williams paid the accused $486 for attorney fees and costs.

 c. The accused deposited the $486 in trust.

 d. The accused did some legal work, but he failed to obtain a judgment.

 e. The accused withdrew $288 from trust.

 f. The accused did not return the $288.

20. *Constante*

 a. Constante retained the accused to represent her in an action for ejectment.

 b. Constante paid the accused $340 for attorney fees and $200 for a title report.

 c. The accused did not deposit the $340 in trust.

 d. The accused did some work, but he failed to file pleadings.

 e. The accused used the $340.

 f. The accused did not maintain a complete record of the $340.

 g. The accused did not return the $340.

21. *Shafer*

 a. Shafer retained the accused to represent him in a securities matter.

 b. Shafer paid the accused $500 for attorney fees and costs.

 c. The accused did not deposit the $500 in trust.

 d. The accused did not maintain a complete record of the $500.

 e. The accused performed no substantial legal services for Shafer.

 f. The accused did not return the $500 to Shafer.

22. *Baker*

 a. Baker retained the accused for representation in an adoption.

 b. Baker paid the accused $157 for attorney fees and costs.

      c.   The accused did some work, but he did not obtain a judgment of adoption.

During the seven-month period in which the accused accepted the above cases, he spent increasing amounts of time at a tavern near his law office. The accused cashed several checks from his client trust account at that establishment.

On July 31, 1990, the accused abruptly left Eugene. He did so without notifying his clients or finding other lawyers for his clients. The Bar's Professional Liability Fund retained lawyers to review the accused's abandoned files, to notify the accused's clients that they should seek new counsel, and to perform emergency legal work. On September 27, 1990, the Lane County Circuit Court appointed a member of the Bar as custodian to take possession and control of the accused's law practice. *See* ORS 9.725 (appointment of custodian of law practice). The Bar's Client Security Fund paid over $6,300 on claims made by the accused's clients, many of whom had never seen the accused after paying him a retainer at their initial meeting.

Although the accused admitted the truth of the above facts, he asserted that he could not form the intent to commit those acts because he suffered at the time from a bipolar disorder, combined with excessive use of alcohol.

■     At the hearing before the trial panel, the accused testified that he was diagnosed in 1987 as having a bipolar disorder. Two doctors testified in those proceedings, and the depositions of three other doctors were received in evidence. A bipolar disorder is an episodic depressive disorder in which the individual experiences depression and which subsequently evokes a manic "compensation" for that depression. The compensatory manic episode can be either acutely manic or hypomanic. The judgment of a patient experiencing a hypomanic state is not significantly impaired, and he or she can function adequately. While such a patient may appear to be somewhat agitated, he or she is not prone to extreme behavior. The patient's energy and activity levels increase, but not to the point of depriving the patient of judgment or reason. During an acute manic state, however, the person's judgment, reasoning, and ability to conform one's conduct to that which is right is almost always impaired. Symptoms of

an acute manic episode include inflated self-esteem or grandiosity, a decreased need for sleep, pressured or rapid speech, flights of ideas, and irritability. In an acute manic state, these mood disturbances are sufficiently severe to cause marked impairment of occupational functioning and frequently require hospitalization or result in incarceration in order to prevent harm to the patient or others.

In the opinions of the doctors who testified (both of whom had examined the accused), the accused was not experiencing an acute manic episode during the period of January through July 1990. The receptionist in the law firm where the accused rented office space, and other witnesses who had observed the accused quite regularly during that seven-month period, testified that they noticed nothing unusual in his behavior, speech, or demeanor. The only testimony in support of the accused's assertion that he was suffering from an acute manic state came from the accused himself. He testified that he was in that state, as demonstrated by his recollections that he sang cowboy songs, required little sleep, drank standing up at a local tavern, and wore dark glasses and western apparel to his office during the period of January through July 1990.

We are not satisfied from the evidence in the record that during the period of January through July 1990 the accused's mental condition was impaired by an acute manic state of a bipolar disorder. We agree with the trial panel's finding that the accused "did in fact suffer from a bipolar disorder and was suffering from a hypomanic or *mildly manic phase* of the disorder in January through July, 1990" and that the accused "was a problem drinker, who used alcohol to excess during the time in question." (Emphasis added.) We also agree with the trial panel's conclusion that neither the bipolar disorder from which the accused suffered nor his excessive use of alcohol rendered him unable to comprehend the wrongfulness of his conduct. Therefore, we review the evidence *de novo* to determine whether the Bar has proven by clear and convincing evidence that the accused violated the various disciplinary rules as charged.

1. *DR 9-101(A): Failure to Deposit Into And Maintain Client Funds In Identifiable Trust Accounts*

■    It is undisputed that the accused failed to deposit the funds of six of his clients into his trust account on receipt. On

receiving retainers and costs from clients Benoit, Masada, Carter, To, Constante, and Shafer, the accused put the money into his general account. The accused claims that he considered the funds to be his on receipt because the fees were minimum or non-refundable fees. He admitted, however, that there were no written fee agreements and that he did not tell his clients that the retainers were non-refundable. Without a clear written agreement between a lawyer and a client that fees paid in advance constitute a non-refundable retainer earned on receipt, such funds must be considered client property and are, therefore, afforded the protections imposed by DR 9-101(A). *See In re Hedges*, 313 Or 618, 623-24, 836 P2d 119 (1992) (in the absence of a specific written agreement, funds considered "client funds" for purposes of DR 9-101(B)). We find that the accused violated DR 9-101(A) with respect to the six clients named above.

The accused also violated DR 9-101(A) with respect to clients Jefferson, Peck, Faile, Suppes, Brown, White, and Williams. The accused withdrew funds belonging to those clients from a trust account before they were earned (or, in the case of Suppes, by failing to deposit *all* of the funds paid to the accused by Suppes into a trust account on receipt).

2.  *DR 9-101(B)(3): Failure To Maintain Complete Records Of Client's Funds And Render Appropriate Accountings To Client*

The accused admitted that he did not maintain complete records of the funds paid to him by 14 clients and that he did not render appropriate accountings regarding their property in his possession. The accused, therefore, violated DR 9-101(B)(3) in 14 separate client matters. Moreover, facts stipulated to by the accused support a finding of two additional violations of DR 9-101(B)(3). The accused was retained by Duncan to recover payments for property owed to her by her former husband. The accused did not maintain a complete record of the $200 retainer that Duncan paid to him for fees. The accused further failed to deposit $400 of the $500 retainer that he received from Suppes into his trust account, and he converted the $400 to his own use. We find, therefore, that the accused is guilty of 16 violations of DR 9-101(B)(3).

### 3. *DR 1-102(A)(3): Conduct Involving Dishonesty, Fraud, Deceit or Misrepresentation*

■ The accused admitted that he received retainers and costs from four clients (Benoit, Carter, Brohmer, and Poland), but he performed no legal services whatsoever for those clients. The accused also admitted that he deposited advanced funds from seven clients (Peck, Faile, Suppes, White, Brown, Williams, and Jefferson), but he removed all or most of their money from his trust account before he had performed legal work to have earned the fees. The accused also received retainers from four other clients (To, Constante, Masada, and Shafer) and never deposited them into his trust account. The accused did not perform the professional services that he had agreed to perform in exchange for the fees paid by each of those four clients, thereby converting clients' funds when he had not earned them. DR 1-102(A)(3) prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit or misrepresentation. A lawyer is guilty of conversion, a violation of *former* DR 1-102(A)(4) (current DR 1-102(A)(3)), if he pays himself unearned fees from client funds. *In re Thomas*, 294 Or 505, 525, 659 P2d 960 (1983). *See also In re Benjamin*, 312 Or 515, 521, 823 P2d 413 (1991) (a lawyer who holds money in trust for another and converts it has engaged in dishonest conduct prohibited by DR 1-102(A)(3)). We find by clear and convincing evidence that the accused engaged in dishonest conduct in violation of DR 1-102(A)(3) when he converted the funds from the above-named clients.

### 4. *DR 6-101(B): Neglect Of Legal Matter Entrusted To Lawyer*

■ A lawyer's failure to take action after being retained by a client for legal services constitutes neglect, in violation of DR 6-101(B). *In re Purvis*, 306 Or 522, 524-25, 760 P2d 254 (1988); *In re Thies*, 305 Or 104, 108-09, 111, 750 P2d 490 (1988). The Bar must prove only a course of negligent conduct to establish a violation of DR 6-101(B). *In re Collier*, 295 Or 320, 329-30, 667 P2d 481 (1983). The Bar provided clear and convincing evidence that the accused neglected the cases he undertook for 17 different clients during the period of January through July 1990, including the accused's admissions that he did not perform the services for which he was

retained. We, therefore, find that the accused violated DR 6-101(B) as to those 17 cases.

5. *DR 2-110(B)(3): Failure To Withdraw From Employment Because Of Mental Or Emotional Condition*
   *DR 2-110 (A)(2): Failure To Avoid Foreseeable Prejudice To Client On Withdrawal From Employment*

■     DR 2-110(B)(3) requires a lawyer to withdraw from employment when the lawyer's physical or mental condition renders it unreasonably difficult for the lawyer to carry out employment effectively. *In re Loew*, 296 Or 328, 334, 676 P2d 294 (1984). DR 2-110(A)(2) requires a lawyer to take reasonable steps to avoid the foreseeable prejudice to the rights of the lawyer's client when the lawyer withdraws from representation. The accused admitted that his mental condition and excessive use of alcohol rendered it unreasonably difficult for him to effectively carry out his employment by the 22 clients identified *supra*. The accused further admitted that he ceased practicing law on July 31, 1990, but he took no steps to avoid foreseeable prejudice to the rights of those clients. With respect to his separate employment by each of the 22 clients, therefore, the accused violated DR 2-110(B)(3) and DR 2-110 (A)(2).

## SANCTION

■     In determining the appropriate sanction for a lawyer who has violated the disciplinary rules, this court looks to the American Bar Association Standards for Imposing Lawyer Sanctions (1991) (ABA Standards). *In re Spies*, 316 Or 530, 541, 852 P2d 831 (1993). The ABA Standards consider four factors: (1) the ethical duty violated; (2) the lawyer's mental state; (3) the potential or actual injury caused by the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors. ABA Standard 3.0. We discuss each in turn.

1. *Ethical Duties Violated*

In all of the matters in which we have found the accused guilty, the accused violated his duties to his clients. Those obligations include the duty to preserve client property and the duty to act with reasonable diligence. By abruptly and improperly withdrawing from representation of 22 clients

when he abandoned his law practice, the accused also violated a duty to his profession.

## 2. *Mental State*

As previously stated, the accused's assertion that a bipolar disorder, alone or in concert with excessive use of alcohol, negated any culpable mental state is unsupported by the evidence. In converting his clients' funds, the accused acted intentionally or with the conscious, objective purpose to accomplish a particular result. When he neglected his clients' interests and abruptly abandoned their cases, the accused acted knowingly, which is defined in ABA Standards at 7 as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result."

## 3. *Injury*

The accused's misconduct resulted in serious injuries to his clients, to the Professional Liability Fund, and to the Client Security Fund. As noted, many of the accused's clients received no professional services for the fees and costs that they advanced. Many of the accused's clients were required to retain new counsel to complete the legal work for which they had retained the accused. The Client Security Fund paid $6,291 to resolve 24 claims made by the accused's clients. The Professional Liability Fund paid other lawyers over $26,000 in legal fees and costs to determine the status of the cases abandoned by the accused and to perform interim legal services before the cases were transferred to a custodian.

## 4. *Aggravating and Mitigating Factors*

Mitigating factors present here include the absence of a prior disciplinary record and letters from six lawyers who stated that before 1982 the accused had a good reputation. *See* ABA Standard 9.32(a) (absence of disciplinary record); 9.32(g) (character or reputation).

The record is replete with evidence of aggravating factors. The accused acted with a dishonest or selfish motive when he converted the funds of his clients. ABA Standard 9.22(b). The record reveals a pattern of multiple offenses. ABA Standard 9.22(c) and 9.22(d). The accused has demonstrated indifference to making restitution, citing financial

inability, but expressing no sense of responsibility to repay his victims. ABA Standard 9.22(j).

Although the accused relied on an acute manic episode and alcoholism as the reasons for his misconduct, he has not sought professional treatment for either condition. After July 31, 1990, the day that he abandoned his law practice, he sought medical advice only for forensic purposes, *i.e.*, in an attempt to establish that he was incapable of comprehending the wrongfulness of his conduct. He does not take the medication that previously had been prescribed for him.

In *In re Benjamin, supra*, 312 Or at 515, this court disbarred a lawyer who used client money to pay personal expenses. On other occasions, this court has disbarred lawyers for misappropriating client funds. *See, e.g., In re Phelps*, 306 Or 508, 760 P2d 1331 (1988); *In re Eads*, 303 Or 111, 734 P2d 340 (1987); *In re Jordan*, 300 Or 430, 712 P2d 97 (1985).

ABA Standard 4.11 suggests that in the absence of mitigating circumstances a lawyer who knowingly converts client property and causes injury to a client should be disbarred. Disbarment also is warranted when a lawyer abandons his or her practice and causes serious or potentially serious injury to a client. ABA Standard 4.41(a). The aggregate misconduct described herein clearly warrants disbarment.

The accused is disbarred.